## IN THEUNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

| | |
|---|---|
| **R.H., a minor, by her Mother and Next Friend, MICHELLE HUGAR**<br>14966 Chicory Ct<br>Woodbridge, VA  22193<br><br>and<br><br>**MICHELLE HUGAR**<br>14966 Chicory Ct<br>Woodbridge, VA  22193<br><br>        **Plaintiffs,**<br><br>*v.*<br><br>**SANJAY PRASAD, M.D.**<br>9308 Belle Terre Way<br>Potomac, MD 20854<br><br>and<br><br>**SANJAY PRASAD, M.D., P.A.**<br>1101 Wootton Parkway<br>Suite 900<br>Potomac, Maryland 20854<br><br>Serve:  **Resident Agent**<br>      Sanjay Prasad<br>      9308 Belle Terre Way<br>      Potomac, MD 20854,<br><br>and<br><br>**TOWER OAKS SURGERY CENTER, LLC**<br>3200 Tower Oaks Blvd.<br>Rockville, Maryland 20852<br><br>Serve:  **Resident Agent**<br>      William H. Roberge, Jr., Esq.<br>      9210 Corporate Blvd.<br>      Suite 390<br>      Rockville, Maryland 20850<br><br>        **Defendants.** | Civil Action No.: |

## COMPLAINT

Plaintiffs, Michelle Hugar, Individually, and R.H., a minor, through her mother and next friend Michelle Hugar and by their attorneys, J. Philip Kessel, Edward L. Norwind, Murray D. Scheel and Demosthenes Komis of the law firm of Karp, Frosh, Wigodsky & Norwind, P.A., state the following as their cause of action against Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A. and Tower Oaks Surgery Center, LLC.

## JURISDICTION AND PARTIES

1.  Subject matter jurisdiction in this action is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Plaintiffs are citizens of the Commonwealth of Virginia. Defendant Sanjay Prasad, M.D. is a citizen of the State of Maryland.  Defendant Sanjay Prasad, M.D., P.A. is a corporation organized and existing under the laws of Maryland with its principle place of business in Maryland.  Defendant Tower Oaks Surgery Center, L.L.C. is a corporation organized and existing under the laws of Maryland with its principle place of business in Maryland.  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.  At all relevant times, Defendant Sanjay Prasad, M.D. (Dr. Prasad) was a licensed Maryland physician with a specialty in otolaryngology, providing services on an ongoing basis as an otolaryngologist in Montgomery County, Maryland.  Defendant Tower Oaks Surgery Center, L.L.C. (Tower Oaks) owned and operated the Tower Oaks Surgery Center, an Ambulatory Surgical Facility licensed by the State of Maryland.

3.  Upon information and belief, Dr. Prasad was at all relevant times an employee or agent of Defendant Sanjay Prasad, M.D., P.A., and an employee or agent of Defendant Tower Oaks, acting within the scope of his employment or agency.

4.      The medical and surgical care and treatment in question was rendered in Montgomery County, Maryland.  Venue is proper in this District Court pursuant to 28 U.S.C. §§ 100 and 1391 (a) (2).

5.      At all relevant times, Defendants held themselves out to the public at large as possessing that degree of skill, knowledge, and ability ordinarily possessed by health care providers acting under the same or similar circumstances, and, in their care and treatment of the minor plaintiff, these defendants owed a duty to exercise the degree of care, skill, and judgment ordinarily exercised by health care providers in like or similar circumstances.

6.      At all relevant times, Tower Oaks owed an independent duty to Plaintiffs R.H. and Michelle Hugar to operate Tower Oaks Surgery Center in accordance with standards of quality of care and patient safety required by Maryland statutes and regulations including, but not limited to, COMAR Sections 10.05.01.06, 10.05.01.07, 10.05.01.09, 10.05.01.10, and 10.05.05.06.

7.      This matter was the subject of a Maryland Health Care Alternative Dispute Resolution Office (HCADRO) proceeding filed against all defendants. Plaintiffs filed a waiver of HCADRO Arbitration pursuant to Maryland Code Ann., Courts and Judicial Proceedings, § 3-2A-06B and an Order of Transfer to the United States District Court for the District of Maryland was entered on March 28, 2013.


## COUNT I

### (R.H.'s Claim – Medical Negligence)

8.      Paragraphs 1 – 7 are re-alleged and incorporated by reference herein.

9.      R.H. was born in 2001.  As of the time of her first visit of July 21, 2009 with Dr.

Prasad, the minor plaintiff was an eight year old female with Turner's syndrome (Mosaic type)

and a history of recurrent ear infections (otitis media) occurring in an intermittent pattern since

her first year of life.  Her ear infections were treated medically with antibiotics and surgically

with myringotomy and bilateral pressure equalization tube (P.E. tube) placement (4 procedures).

10.      R.H.'s  first P.E. tubes were placed at approximately twenty-one months of age at

Walter Reed Army Medical Center (WRAMC).  R.H. received her last bilateral P.E. tube

placement on May 8, 2007 when she was approximately six years of age.  Both tubes were intact

at the time of Dr. Prasad's initial examination.

11.      As of July 21, 2009, R.H.'s last ear infection had occurred in the first week of

May, 2009 and had resolved with treatment by her former otolaryngologist Manish Khanna,

M.D., who referred her to Dr. Prasad for Neurotology evaluation.  Neurotology is a subspecialty

of Otolaryngology.

12.      R.H.'s only current complaint as of 07/21/09 was bilateral hearing loss.  Dr.

Prasad noted her Review of Systems was non-contributory.  Dr. Prasad's examination of her

external ear canals was unremarkable.  Dr. Prasad did not document any examination or record

any findings related to R.H.'s tympanic membranes (eardrums) or middle ear cavities.

Audiology testing performed on 07/21/09 confirmed bilateral conductive hearing loss, worse on

the right. Dr. Prasad recommended right tympanomastoidectomy surgery at the first visit.  He

ordered a CT Scan of the temporal bone.

13.      Tympanomastoidectomy surgery combines the performance of two procedures,

tympanoplasty (with or without ossicular reconstruction) and mastoidectomy in a single

operation.  Tympanoplasty is a surgical procedure performed to eradicate infection and restore

the function of the middle ear.  Mastoidectomy is a surgical procedure performed to eradicate infection from the mastoid portion of the temporal bone by removing the mastoid cortex and varying amounts of the mastoid air cell system, depending upon the disease process.

14.     Tympanomastoidectomy involves entry of the middle ear by surgical excision of the mastoid part of the temporal bone located behind the ear (postauricular approach). Tympanomastoidectomy is performed under general anesthesia and requires a lengthy period of post-operative recuperation during which the patient must remain relatively immobile.

15.     Indications for tympanomastoidectomy include cholesteatoma (a type of benign cyst in the middle ear that can grow or become infected and damage the ossicular chain) and chronic suppurative otitis media (middle ear infection marked by eardrum rupture and persistent purulent drainage) that does not resolve with antibiotic treatment.  R.H. had neither of these conditions as of the time of her treatment with Dr. Prasad.  R.H.'s only current complaint as of her initial visit with Dr. Prasad was hearing loss.

16.     CT scan of the temporal bones without contrast (7/27/09) confirmed that there were no signs of infection or any active disease process in R.H.'s middle ear or mastoid on the right or left.  The radiologist documented that R.H.'s right middle ear cavity was unopacified, indicating a normal air-filled middle ear with no fluid, infection or other disease process debris occupying the middle ear.  The findings documented normal alignment of the middle ear bones (malleus, incus and stapes, also referred to as the ossicular chain), which, by vibrating, conduct sound energy from the eardrum to the inner ear.  R.H.'s ossicular chain was normal with no signs of erosion.  Dr. Prasad interpreted this CT Scan as revealing "minimal fluid in the mastoids," contradicting his diagnosis of "chronic atticoantral suppurative otitis media."

17.     Notwithstanding the absence of signs or symptoms of any disease process in R.H.'s middle ear or mastoid, Dr. Prasad erroneously diagnosed R.H. with "chronic atticoantral suppurative otitis media," a condition defined by eardrum rupture and persistent (weeks long) purulent drainage in the middle ear (and sometimes extending to the mastoid) as well as other signs and symptoms of active infection (pain, redness, swelling), which in some cases can only be eradicated by surgical treatment.

18.     Dr. Prasad did not request or obtain any of R.H.'s prior four years of treatment records, including audiograms and a prior CT Scan of the temporal bone, kept by her former treating otolaryngology physicians, including Manish Khanna, M.D. who referred R.H. and her mother to Dr. Prasad.  During the nearly 28 months he treated R.H. from July, 2009 until November, 2011, Dr. Prasad never picked up the phone to discuss her case with Dr. Khanna, or any of his colleagues who had treated R.H. for ear infections since she was four years old.

**First Surgery – 08/09/09**

19.     R.H. was admitted to Tower Oaks Surgery Center on 8/9/09 for the first of three right tympanomastoidectomies by Dr. Prasad.  During the first surgery, Dr. Prasad deconstructed R.H.'s ossicular chain by removing the right malleus head and incus bones.  This was unnecessary and contraindicated since these bones were normal and functional with no signs of erosion.  Reconstruction of R.H.'s ossicular chain with a prosthesis was deferred for a second surgical procedure, leaving her with a maximal conductive hearing loss on the right.

20.     The billings of Dr. Prasad and Tower Oaks for the 8/9/09 surgery included amounts billed for a procedure "Release Facial Nerve, Lat to Gen" which was not described or mentioned in Dr. Prasad's operative report or in the written operative consent.  If Dr. Prasad

performed a release of the facial nerve, this procedure was unnecessary, contraindicated and unconsented.

21.     The facial nerve is also known as the seventh nerve.  The preoperative CT Scan of the temporal bone (7/27/09) documented "Normal course of the right VII nerve."  A subsequent CT Scan of the temporal bone (6/22/10) documented "normal course of the right seventh nerve" and a third CT Scan (7/22/11) found "the course and path of the facial nerves … unremarkable." Dr. Prasad's operative findings of his *third* surgery of 11/18/10 included: "Facial nerve intact and non-dehiscent."

22.     In his first surgery, Dr. Prasad described and billed for a "subtemporal middle fossa craniectomy and excision of extradural granulation tissue," a surgical procedure which involves drilling through the base of the skull and exposing the dura, the outermost fibrous membrane covering the brain and the spinal cord and lining the inner surface of the skull.  This procedure was unnecessary, contraindicated and unconsented.  Tower Oaks also billed for this procedure.

23.      "Subtemporal middle fossa craniectomy and excision of extradural granulation tissue," a separate surgical procedure, was not mentioned in the written operative consent for the first surgery, signed by Michelle Hugar on the morning of 08/09/09.  Post-operatively, Dr. Prasad did not inform Michelle Hugar that he had performed a craniectomy on R.H. or had exposed her dura.  He did not inform Michelle Hugar of any of the risks of craniectomy or dura exposure, including spinal fluid leak, spinal fluid abscess, meningitis, stroke or death.

**Second Surgery – 02/26/10**

24.     R.H. was admitted to Tower Oaks Surgery Center on 2/26/10 for Dr. Prasad's second surgery, ostensibly for the purpose of reconstructing her right ossicular chain with a

prosthesis.  Despite the fact that he had found no cholesteatoma at the surgery of 8/09/09, Dr.

Prasad incorrectly listed "cholesteatoma" as his preoperative and postoperative diagnosis for the

second surgery.  No evidence of cholesteatoma was noted by Dr. Prasad in any of his operative

findings or examination records from July, 2009 through November, 2011.

25.     At the second surgery, Dr. Prasad reconstructed R.H.'s ossicular chain with a

prosthesis described as a Total Ossicular Replacement Prosthesis (TORP) between the malleus

handle and stapes footplate.  According to Dr. Prasad, "an excellent bounce was noted upon

palpation," indicating that the prosthesis was properly placed and the connection secure.

26.     In the 2/26/10 surgery, Dr. Prasad described and billed for a second "subtemporal

middle fossa craniectomy and excision of extradural granulation tissue."  This procedure was

unnecessary, contraindicated, and unconsented.  Tower Oaks also billed for this procedure.

27.     In the second surgery, Dr. Prasad described and billed for "decompression and

mobilization of the tympanic segment of the facial nerve."  This procedure, also billed for by

Tower Oaks, was unnecessary, contraindicated and unconsented.

28.     Dr. Prasad's operative finding that the facial nerve was "completely dehiscent" is

flatly contradicted by his operative findings on 8/09/09 and 11/18/10, which stated "Facial nerve

intact and non-dehiscent," and the radiological findings of a normal facial nerve (seventh nerve)

which followed a normal course as demonstrated by preoperative and postoperative CT Scans of

the right temporal bone (7/27/09, 6/22/10, 7/22/11).

29.     Although the decompression and mobilization of the facial nerve probably did not

occur as described and billed for by Dr. Prasad and Tower Oaks, R.H.'s post-operative right

facial paresis following the surgery of 2/26/10 demonstrated that her facial nerve was disturbed

during Dr. Prasad's unnecessary surgery.  This complication was neither recognized nor

mentioned in Dr. Prasad's post-operative notes.  When questioned by Michelle Hugar concerning R.H.'s apparent paralysis at the right side of her mouth, Dr. Prasad explicitly denied that this could have resulted from his surgery.

30.     Dr. Prasad's 2/26/10 operative report stated he downfractured the superstructure of the stapes off of a mobile footplate.  No operative consent was obtained for this procedure. This procedure was contraindicated because of the unacceptable risk of traumatic inner ear nerve injury resulting in significant hearing loss and imbalance.  Post-operatively R.H. had additional severe and permanent hearing loss documented with post-operative audiology test results.

31.     Following the 2/26/10 surgery, Dr. Prasad did not inform Michelle Hugar that he had performed a craniectomy on R.H. or had exposed her dura.  He did not inform Michelle Hugar of any of the risks of craniectomy or dural exposure.

32.     Instead of improving with the reconstruction of her ossicular chain, R.H.'s hearing on the right worsened significantly following the 2/26/10 surgery.  Post-operative testing revealed that her right ear was essentially dead with no conductive hearing or capacity to understand language which she possessed preoperatively on the right side.  By contrast, R.H.'s conductive hearing and ability to understand speech with her left *untreated* ear remained stable and unchanged.

33.     Subsequently, Dr. Prasad ordered a CT Scan (6/22/10) of the temporal bones which found: "There is a closely approximated ossicular chain prosthesis whose tip is likely just superior to the oval window." Without ascertaining the cause for the failure of the prosthesis to restore any of R.H.'s conductive hearing, or the reason why her conductive hearing and speech discrimination were significantly worse than her preoperative condition of 7/21/09, Dr. Prasad

inexplicably recommended that she undergo a third tympanomastoidectomy. This surgery, like the first two tympanomastoidectomies, was unnecessary and contraindicated.

**Third Surgery – 11/18/10**

34.     On 11/18/10, R.H. was admitted to Tower Oaks Surgery Center for her third tympanomastoidectomy in fifteen months. Despite the fact that he had found no cholesteatoma at the surgeries of 08/09/09 and 02/26/10, Dr. Prasad erroneously included "history of right cholesteatoma" as his preoperative and postoperative diagnosis for the third surgery. No evidence of cholesteatoma was noted by Dr. Prasad in his operative findings of 08/09/09, 02/26/10, or 11/18/10.

35.     At the surgery of 11/18/10, Dr. Prasad replaced the old prosthesis, which he described as "bulky" and out of position with a titanium prosthesis inserted between the tympanic membrane and stapes footplate.

36.     As in the first two surgeries, Dr. Prasad described and billed for "subtemporal middle fossa craniectomy and excision of extradural granulation tissue." This procedure was unnecessary, contraindicated, and unconsented. Tower Oaks also billed for this procedure.

37.     In the 11/18/10 surgery, Dr. Prasad described and billed for a procedure described as "Stapes mobilization." This procedure, also billed for by Tower Oaks, was unnecessary and contraindicated in light of Dr. Prasad's operative finding that the stapes footplate was intact and mobile. Mobilization of a mobile stapes footplate was not only unnecessary, but carried the risk of nerve damage and sensorineural hearing loss with no countervailing therapeutic benefit.

38.     Following the 11/18/10 surgery, Dr. Prasad did not inform Michelle Hugar that he had performed a craniectomy on R.H. or had exposed her dura. He did not inform Michelle Hugar of any of the risks or complications of craniectomy or dural exposure. Likewise, Dr.

Prasad did not inform Michelle Hugar that he had performed Stapes mobilization and did not mention any of the risks or complications of this procedure.

39.     Dr. Prasad's replacement of R.H.'s prosthesis on 11/18/10 failed to restore her conductive hearing to a functional level and failed to restore her ability to understand speech with her right ear.   Her conductive hearing level and capacity for speech discrimination on the right remained in the non-functional range significantly below the functional levels measured preoperatively.  The net result of Dr. Prasad's three surgeries was to destroy the hearing in R.H.'s right ear by rendering it non-functional, while her hearing in the left *unoperated* ear remained stable and unchanged.

40.     Dr. Prasad noted at all of the post-operative visits following the third surgery (12/14/10, 3/8/11, 7/19/11, 8/2/11, 8/23/11, 11/8/11), that the implant was in "proper position." At all of these visits, he noted erroneously that R.H. "presents with a cholesteatoma … in the right ear."

41.     Dr. Prasad's office visit notes contain no analysis of the reason for his surgical failures and no explanation for the absence of any functional hearing in the operated ear.  The fact that R.H.'s conductive hearing and speech discrimination had declined dramatically from their preoperative baseline was neither considered nor even acknowledged in Dr. Prasad's notes of his office visits with R.H. and her mother.

42.     On 7/19/11, Dr. Prasad ordered another CT Scan of the temporal bone which was performed on 7/22/11.  This study found that "Prosthesis between the TM and the oval window appears to be intact."  Dr. Prasad, however, interpreted the study as showing "Implant out of position."

43.     Dr. Prasad recommended that R.H. undergo a fourth tympanomastoidectomy.   At this point Ms. Hugar asked Dr. Prasad, what if the fourth surgery fails are you going to recommend a fifth surgery, and if that fails a sixth surgery?   At this point, Dr. Prasad paused and replied, "You're right, we should leave her alone."

44.     Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A. and Tower Oaks negligently:

a)      Performed and billed for surgical procedures on 08/09/09, 02/26/10 and 11/18/10 which were unnecessary, contraindicated and of no therapeutic benefit to R.H.;

b)      Charged and collected payment of surgical fees and costs for surgical procedures which were not performed on 08/09/09, 02/26/10 and 11/18/10;

c)      Performed, charged and collected payment for irrelevant and unnecessary audiometric examinations including acoustic reflex testing on 07/21/09, 10/13/09, 11/17/09, 02/16/10, 04/19/10, 08/24/10, 11/01/10, and 01/04/11;

d)      Failed to obtain a second opinion from a qualified otolaryngology specialist prior to performing tympanomastoidectomy on R.H.;

e)      Failed to inform plaintiffs that dural exposure had occurred on 08/09/09, 02/26/10 and 11/18/10;

Defendant Tower Oaks, individually, was negligent in:

g)      failing to provide medical and surgical care and treatment to R.H. in accordance with statutes and regulations applicable to Ambulatory Surgical Facilities licensed in the State of Maryland including, but not limited to,

COMAR Sections 10.05.01.06, 10.05.01.07, 10.05.01.09, 10.05.01.10, and 10.05.05.06.

45. As a direct result of the foregoing negligence, R.H. has suffered and in the future will suffer, pain, mental anguish, and severe and permanent otologic injuries, damages and disability. She has and in the future will sustain medical expenses for the care and treatment of her otologic injuries and damages. She has sustained a permanent impairment of her future earning capacity and has been damaged in other ways.

**WHEREFORE,** Plaintiff Michelle Hugar, as parent and next friend of R.H., a minor, demands judgment, jointly and severally, against Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A. and Tower Oaks Surgery Center, LLC for compensatory damages in excess of the required jurisdictional amount, plus interest and costs, and any and all other relief to which the Plaintiffs may be entitled.

## Count II

### (Michelle Hugar's Claim-Medical Negligence)

46. Paragraphs 1 - 45 of this Complaint are re-alleged and incorporated by reference herein.

47. As a direct result of the aforementioned negligence of Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A., and Tower Oaks Surgery Center, Plaintiff Michelle Hugar, as the mother of the minor plaintiff, has incurred and in the future will incur expenses for R.H.'s medical care and treatment related to her otologic injuries and damages until she attains the age of eighteen. Plaintiff Michelle Hugar has been damaged in other ways.

**WHEREFORE**, Plaintiff Michelle Hugar, individually, demands judgment, jointly and severally, against Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A. and Tower Oaks

Surgery Center, LLC in an amount that exceeds the required jurisdictional amount plus interest and costs.

**COUNT III**

**(R.H.'s Claim – Informed Consent)**

48.     Paragraphs 1- 45 of this Statement of Claim are re-alleged and incorporated by reference herein.

49.     Defendants had a duty, prior to each of the proposed surgeries in question, to explain the proposed surgical treatment to R.H.'s mother, Plaintiff Michelle Hugar, and warn her of any material risks or dangers of the treatment so that Ms. Hugar could make an intelligent and informed decision on behalf of the minor plaintiff about whether or not to go forward with each of the proposed surgeries in question.

50.     Defendants failed to obtain Plaintiffs' informed consent for the procedures of 08/09/09, 02/26/10 and 11/18/10 by:

a)     Failing to identify or describe each proposed procedure to Plaintiffs before it was performed;

b)     Failing to disclose in advance the nature and purpose of each of the proposed procedures;

c)     Failing to disclose the probability of success of each of the proposed procedures and any alternative surgical or non-surgical treatment;

d)     Failing to disclose the material risks of unfortunate outcomes associated with each of the proposed procedures.

e)     Failing to inform Plaintiffs that dural exposure had occurred on 08/09/09, 02/26/10 and 11/18/10;

Defendant Tower Oaks, individually, failed to obtain the informed consent of plaintiffs for the surgical procedures of 08/09/09, 02/26/10 and 11/18/10 by:

f)      Failing to obtain the informed consent of Plaintiffs as required by Maryland statutes and regulations including, but not limited to, COMAR Sections 10.05.01.06, 10.05.01.07, 10.05.01.09, 10.05.01.10, and 10.05.05.06.

51.     Had the Defendants made the disclosures necessary to obtain the informed consent of Michelle Hugar on behalf of the minor plaintiff, Michelle Hugar would have declined permission for Dr. Prasad to perform the surgical procedures in question on her daughter.

**WHEREFORE,** Plaintiff Michelle Hugar, as parent and next friend of R.H., a minor, demands judgment, jointly and severally, against Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A., and Tower Oaks Surgery Center for compensatory damages in excess of the required jurisdictional amount, plus interest and costs, and any and all other relief to which the Claimants may be entitled.

## COUNT IV

### (Michelle Hugar's Claim – Informed Consent)

52.     Paragraphs 48 - 51 of this Statement of Claim are re-alleged and incorporated by reference herein.

53.     As a direct result of the failure of Defendants to obtain the informed consent of Plaintiffs for the proposed treatment in question, Plaintiff Michelle Hugar has incurred and in the future will incur expenses for R.H.'s medical care and treatment and related expenses until she attains the age of eighteen and has been damaged in other ways.

**WHEREFORE,** Plaintiff Michelle Hugar, individually, demands judgment, jointly and severally, against Defendants Sanjay Prasad, M.D., Sanjay Prasad, M.D., P.A. and Tower Oaks Surgery Center in an amount that exceeds the required jurisdictional amount plus interest and costs.

Respectfully Submitted,

**KARP FROSH, WIGODSKY & NORWIND, P.A.**

J. Philip Kessel, Esq., Bar No. 02008
pkessel@karpfrosh.com

Edward L. Norwind, Esq., Bar No. 08858
lnorwind@karpfrosh.com

Murray D. Scheel, Esq., Bar No. 28070
mscheel@karpfrosh.com

Demosthenes Komis, Esq., Bar No.30147
dkomis@karpfrosh.com

2273 Research Boulevard, Suite 200
Rockville, Maryland 20850
301-948-3800 (p)  301-948-5449 (f)
*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

J. Philip Kessel